AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California



**FILED**
7/28/2023
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY   vyc   DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Black iPhone
Model: Unknown
With no other identifying numbers or features

Case No. 23MJ8569-LR

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Transportation of Illegal Aliens |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Robert Perez incorporated herein by reference.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Border Patrol Agent Robert Perez
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: 7/28/23

_____
*Judge's signature*

City and state: EL CENTRO, CALIFORNIA    HON. LUPE RODRIGUEZ JR., U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A
PROPERTY TO BE SEARCHED

The following property is to be searched:

>Black iPhone
>Model: Unknown
>With no other identifying numbers or features
>Seized from Gael Jair LANDAZURI
>**(Target Device)**



    The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of April 24, 2023, up to and including May 25, 2023, and is limited to the following:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the Target Device;

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of 8 U.S.C. § 1324.

# AFFIDAVIT

I, Robert Perez, United States Border Patrol Agent, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device:

> Black iPhone
> Model: Unknown
> With no other identifying numbers or features
> Seized from Gael Jair LANDAZURI
> **(Target Device)**

as further described in Attachment A, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Joel ARAGON, Jr. (ARAGON), Gael Jair LANDAZURI (LANDAZURI), and Carlos Alexis GONZALEZ (GONZALEZ) for illegally bringing into the United States non-citizen, Jose Francisco LEON-Garcia (LEON) in violation of Title 8, United States Code, Section 1324 within the Southern District of California. The Target Device was seized from LANDAZURI on or about May 24, 2023, incident to his arrest. The Target Device is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I, or others, have learned during the course of this investigation. The information contained in this Affidavit is based upon my personal observations and knowledge, my review of various official reports, and upon conversations with other Border Patrol Agents. Dates and times are approximate.

1

# EXPERIENCE AND TRAINING

4. I am a United States Border Patrol Agent and have been so employed since 2000. I am currently assigned to the El Centro Station, and I am currently a member of the El Centro Sector Prosecutions Unit. I am a graduate of the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia and a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized by Rule 41(a) of the Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience in and have received training with respect to conducting investigations of violations of Titles 8, 18, 19, and 21 of the United States Code.

5. I am currently assigned to the El Centro Sector Prosecutions Unit. The El Centro Sector Prosecutions Unit is tasked with the responsibility of investigating and prosecuting alien smuggling organizations that utilize the Southern and Central Districts of California as an operational corridor. In the course of my duties as a Border Patrol Agent, I investigate and prepare cases for prosecution against persons involved in the inducement of the illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States.

6. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit,

providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

7. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing to make smuggling arrangements, receive instructions, and report their locations after crossing.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

9. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

10. On May 24, 2023, at approximately 3:00 p.m., the Calexico Border Patrol Station Remote Video Surveillance System operator (841) observed multiple individuals on top of the United States/Mexico International Boundary Fence (IBF), south of First Street between Blair Avenue and Heffernan Avenue. This area is located

east of the Calexico, California West Port of Entry and is heavily populated with pedestrian traffic.

11. Shortly after 841 observed the individuals on the IBF, Calexico Border Patrol Agents responded to the area and attempted to apprehend the individuals that had just illegally crossed into the United States, however, not all individuals were apprehended. Border Patrol Agents - Intelligence assigned to the El Centro Sector Field Intelligence Team (FIT) were conducting surveillance in Calexico, California. FIT Agents wear plain clothes and drive unmarked service vehicles to blend in with the public. At this time, FIT Agents were north of the area and began searching for the individuals that had absconded from Calexico Border Patrol Agents.

12. At approximately 3:30 p.m., Border Patrol Agent (BPA) A. Tapia observed an individual, later identified as Jose Francisco LEON-Garcia (LEON), wearing a visibly soaked blue shirt walking up and down Paulin Avenue while conversing on his cell phone. BPA A. Tapia believed that LEON was one of the individuals that had absconded from Calexico Border Patrol Agents and relayed to additional FIT Agents of his observation.

13. FIT Agents established a perimeter in the area and began conducting static surveillance. FIT Agents watched as LEON walked north on Paulin Avenue towards Seventh Street towards three individuals, two of which were later identified as Carlos Alexis GONZALEZ (GONZALEZ) and Gael Jair LANDAZURI (LANDAZURI). As LEON walked past the three individuals, FIT Agents observed that both LEON and LANDAZURI were on their cell phones. FIT Agents observed LEON walk past, come back and briefly talk to the three individuals who pointed and directed him towards a nearby Jack in the Box. LEON went into the Jack in the Box, came out and went into a nearby McDonald's. BPA A. Tapia exited his unmarked service vehicle and entered McDonalds's to see if LEON would meet with anyone inside of McDonald's. Additional FIT Agents positioned their unmarked service vehicles in the parking lot of McDonald's to conduct surveillance.

14. While inside of McDonald's, BPA A. Tapia watched as LEON ordered food and talked on his cell phone. BPA A. Tapia also observed that GONZALEZ, LANDAZURI, and the third individual were sitting at a table. BPA L. Heipt, who was positioned in the McDonald's parking lot observed GONZALEZ walk outside and stand in front of McDonald's by the parking lot, acting as a lookout. BPA L. Heipt then observed a white Chevrolet Tahoe (Tahoe), bearing California license plates, park next to him. While GONZALEZ remained positioned outside of McDonald's, and the driver of the Tahoe, later identified as Joel ARAGON (ARAGON) remained inside of the Tahoe on his cell phone, BPA A. Tapia informed FIT Agents that LANDAZURI approached LEON and was conversing with him.

15. After GONZALEZ walked back inside of McDonald's, BPA A. Tapia watched as LANDAZURI walked LEON to the Tahoe, opened the rear passenger door of the Tahoe and ushered LEON inside of the Tahoe. Once LEON was inside of the Tahoe and LANDAZURI walked back inside of McDonald's, the Tahoe reversed out of the parking space and began travelling northbound on Imperial Avenue. After observing the body transfer, FIT Agents firmly believed that they had witnessed an alien smuggling scheme.

16. At this time, Supervisory Border Patrol Agent (SBPA) C. Pluim was contacted and informed of FIT Agents' observations. BPA A. Tapia continued surveillance on GONZALEZ, LANDAZURI, and the third individual as they exited McDonald's and walked towards Seventh Street. Once SBPA C. Pluim arrived, GONZALEZ, LANDAZURI, and the third individual were questioned as to their citizenship, detained, and transported to the Calexico Border Patrol Station for further investigation.

17. Meanwhile, FIT Agents kept constant visual on the Tahoe as it travelled towards El Centro, California and entered the parking lot of the Walmart Supercenter, located at 2100 Block Waterman Avenue, El Centro, California. FIT Agents

strategically positioned their unmarked service vehicles in the Walmart parking lot and watched as the Tahoe parked and ARAGON exited the Tahoe and entered Walmart.

18. Prior to arriving at Walmart, record checks on the Tahoe's license plate were queried through dispatch. Records checks showed that the Tahoe was pending master file to Joel ARAGON in Calexico, California. After approximately twenty minutes, while LEON remained in the back seat of the Tahoe, ARAGON exited Walmart and returned to the Tahoe. After a few stops, the Tahoe then began travelling towards the city of Brawley. Once in Brawley, after a series of turns, the Tahoe began travelling eastbound on Main Street which turns into Highway 78. FIT Agents know from experience, as well as current tactics and trends utilized by alien smugglers, that Highway 78 connects to Interstate 10 and is often a route utilized by alien smugglers to travel to Los Angeles, California.

19. As the Tahoe continued travelling eastbound on Highway 78, SBPA-Intelligence M. Clinton and BPA A. Garcia travelled ahead of the Tahoe and positioned their unmarked service vehicles at the intersection of Butters Road and Highway 78 with Vehicle Immobilization Devices (VID) in anticipation that the Tahoe would fail to yield once FIT Agents attempted a vehicle stop. As the Tahoe was travelling northbound on Butters Road, BPA L. Heipt positioned his unmarked service vehicle behind the Tahoe and activated the emergency lights and sirens. After BPA L. Heipt activated the emergency lights and sirens, the Tahoe accelerated in speed and continued travelling northbound back towards Highway 78. As BPA L. Heipt continued to pursue the Tahoe, it became evident that the Tahoe was failing to yield to the emergency lights and sirens.

20. As the Tahoe continued to evade BPA L. Heipt and failed to yield, the Tahoe approached SBPA M. Clinton's and BPA A. Garcia's location. SBPA M. Clinton and BPA A. Garcia deployed Vehicle Immobilization Devices (VID's) and the front passenger tire was successfully immobilized. After successfully immobilizing the tire of the Tahoe, the Tahoe pulled over to the side of the road and came to a complete stop.

BPA L. Heipt approached the Tahoe with Border Patrol markings and insignia fully visible and identified himself as a Border Patrol Agent. BPA L. Heipt questioned ARAGON as to his citizenship. ARAGON stated that he was a United States citizen. BPA L. Heipt then questioned LEON as to his citizenship. LEON admitted to being in the United States illegally. LEON admitted that he was a citizen of Mexico. LEON admitted that he made the illegal entry by climbing the border fence in an area other than through a designated Port of Entry. ARAGON and LEON were placed under arrest and transported to the Border Patrol Station for processing.

21. On May 24, 2023, Agent Mark Clinton advised ARAGON of his Miranda Rights. ARAGON acknowledged his rights and elected to answer questions without the presence of an attorney. Prior to any questions being asked, and after he agreed to answer questions without an attorney, ARAGON spontaneously stated that he was just transporting a subject for money and was not involved in smuggling. ARAGON then stated that he was not sure if he could afford a lawyer. ARAGON was advised again that an attorney was free, and his rights were read to him a second time. After acknowledging and understanding his rights again, ARAGON requested an attorney. Once the interview was terminated, ARAGON spontaneously stated that he was caught with an alien.

22. On May 24, 2023, GONZALEZ provided Border Patrol Agent (BPA) A. Garcia with a statement in the Spanish language. GONZALEZ stated he understood his rights and was willing to provide a statement without the presence of an attorney. GONZALEZ stated that he crossed the border to give money to LANDAZURI. GONZALEZ stated that he and his brother met with LANDAZURI near First Street and played cards. GONZALEZ stated they shopped for a few items and then headed to McDonald's accompanied by LANDAZURI. GONZALEZ stated they never met with anyone. GONZALEZ stated he knows smuggling is illegal. GONZALEZ stated that as far as he knows, LANDAZURI did not meet with anyone either. GONZALEZ was presented with six pack photo line-up labeled A and identified Photo #6 as

8

LANDAZURI. GONZALEZ was presented with six pack photo line-up labeled D and identified Photo #5 as his brother. No further questions were asked.

23. Material Witness LEON provided Border Patrol Agent (BPA) A. Garcia with a statement in the Spanish language. LEON stated he was born in Tabasco, Mexico. LEON stated he is a citizen of Mexico. LEON stated that he does not have any legal documents allowing him to live, work or remain in the United States legally. LEON stated that he was to pay $100,000 Mexican pesos to be illegally smuggled into the United States. LEON stated that he illegally entered the United States today by climbing the wall near Mexicali with a ladder. After crossing, he was instructed by phone to head to a restaurant. LEON stated he was approached by a man that instructed him to board a white vehicle. LEON stated he was going to California. LEON was presented with six pack photo line-up labeled A and identified Photo #6 as the person who approached him at the restaurant and instructed him to get in the white vehicle. This photo depicts LANDAZURI. LEON was presented with six pack photo line-up labeled B and identified Photo #4 as the heavy-set person that was driving the white vehicle in which he was arrested. This photo depicts ARAGON.

24. During a search incident to arrest of ARAGON, LANDAZURI, and GONZALEZ one Black iPhone Cellphone (Target Device) was found on LANDAZURI's person by SBPA C. Pluim. Gael Jair LANDAZURI claimed ownership of his cellphone and it was seized as evidence.

25. I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement. In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts. Given this, I respectfully request permission to search the Target Device for data beginning on April 24, 2023, up to and including, May 25, 2023, the day after the arrest of ARAGON, LANDAZURI, and GONZALEZ.

9

## METHODOLOGY

26.     It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants, and have functions such as calendars and full address books, and can be minicomputers allowing for electronic mail services, web services, and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

27.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the Target Device and subject them to analysis. All forensic analysis of the data contained within the telephone, and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this Court.

## CONCLUSION

29. Based on all the facts and circumstances described above, I believe that probable cause exists to conclude that LANDAZURI used the Target Device to facilitate the offense of alien smuggling. The Target Device likely was used to facilitate the offense by transmitting and storing data, specifically that described in Attachment B, which constitutes evidence of violations of Title 8, United States Code, Section 1324. I also believe that probable cause exists to believe that evidence of illegal activity committed by ARAGON, LANDAZURI, GONZALEZ, and the Material Witness, and others continues to exist on the Target Device. Therefore, I respectfully request that the Court issue this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Robert Perez, Border Patrol Agent
United States Border Patrol

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 28th day of July 2023.

2:00 p.m.

HON. LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
PROPERTY TO BE SEARCHED

The following property is to be searched:

>Black iPhone
>Model: Unknown
>With no other identifying numbers or features
>Seized from Gael Jair LANDAZURI
>**(Target Device)**



The **Target Device** is currently in the possession of the Department of Homeland Security, El Centro Border Patrol Sector Asset Forfeiture Office, 211 West Aten Road, Imperial, California 92251, and located in the evidence room of that office.

## **ATTACHMENT B**

ITEMS TO BE SEIZED

Authorization to search the mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of April 24, 2023, up to and including May 25, 2023, and is limited to the following:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the Target Device;

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which is evidence of the transportation of illegal aliens in violation of 8 U.S.C. § 1324.